## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| DAVIN MCCRAY, | |
| Plaintiff, | |
| v. | Civil Action No.: |
| DOLGENCORP, LLC, d/b/a Dollar General Corporation, | |
| Defendant. | **JURY TRIAL DEMANDED** |

## <u>COMPLAINT</u>

COMES NOW, Plaintiff Davin McCray, and brings this action pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq*. Plaintiff alleges that Defendant DOLGENCORP, LLC, d/b/a Dollar General Corporation, subjected Plaintiff to discrimination based on sex, including through the creation of a hostile work environment, and ultimately resulting in Plaintiff's constructive discharge, respectfully showing the Court as follows:

## JURISDICTION AND VENUE

### 1.

This Court has original jurisdiction over the subject matter of this civil action pursuant to the enforcement provisions of Title VII of the Civil Rights Act and 28 U.S.C. § 1331 & 1343.

### 2.

Venue is proper in this judicial district under 42 U.S.C. § 2000e-5(f)(3) and 5 U.S.C. § 7703(b)(2) because Plaintiff was employed, and the events underlying this action, occurred in Gwinnett County, Georgia, which is located in this judicial district.

## PARTIES

### 3.

Plaintiff Davin McCray (hereinafter, "Plaintiff" or "McCray") is a citizen of the United States and a resident of Georgia.  At all times relevant to this suit, Ms. McCray was employed with Defendant DOLGENCORP, LLC, d/b/a Dollar General Corporation

### 4.

At all relevant times, Ms. McCray was considered a covered employee under Title VII of the Civil Rights Act.

5.

Defendant DOLGENCORP, LLC, d/b/a Dollar General Corporation (hereinafter, "Defendant") is a foreign limited liability company, organized under the laws of the State of Kentucky. Defendant's principal office is located at 100 Mission Ridge, Goodlettsville, Tennessee 37072, and Defendant may be served with process through its registered agent, CSC of Cobb County, Inc., located at 192 Anderson Street SE, Suite 125, Marietta, Cobb County, Georgia 30060.

6.

Defendant is a private employer engaged in interstate commerce, with annual revenue in excess of $500,000. Defendant has more than fifteen employees who have worked for at least twenty calendar weeks in 2020 and proceeding years. During the events underlying this action, Defendant employed in excess of 500 individuals. Defendant is a covered entity and employer within the meaning of Title VI of the Civil Rights Act.

**STATEMENT OF FACTS**

7.

Plaintiff hereby pleads and incorporates by reference all of the allegations contained in Paragraphs 1 through 6, as if the same were set forth herein.

8.

Ms. McCray was assigned male at birth, but she identifies and presents as female.

9.

Ms. McCray began her employment with Defendant in or around November 2018.

10.

Most recently, Ms. McCray served in the position of Team Lead, which is also commonly referred to as the "shift manager," at Defendant's "Dollar General" retail store (store number 08548) in Peachtree Corners, Georgia.

11.

At all relevant times, Ms. McCray's performance was exemplary.

12.

After Ms. McCray began her employment, she found that many of her coworkers were courteous toward her and respected the fact that she identifies as a transgender female.

13.

Koleen Kray, the store's Assistant Manager, (hereinafter, "Asst. Mgr. Kray"), who always referred to Ms. McCray using female pronouns, discussed Ms.

McCray's stellar performance, as well as a possible promotion, within several weeks after Ms. McCray began her employment.

14.

Indeed, Ms. McCray was promoted to Team Lead shortly after she began working for Defendant.

15.

However, Store Manager Derika Peoples (hereinafter, "Store Mgr. Peoples"), began exhibiting disrespectful and offensive conduct toward Ms. McCray as soon as Ms. McCray started work.

16.

For example, Ms. McCray later learned that when she began working at this store, Store Mgr. Peoples was speaking with other employees about Ms. McCray, possibly within the earshot of customers, and Store Mgr. Peoples referred to Ms. McCray as male, further insisting that "female" was "not what is on his driver's license."

17.

Ms. McCray became extremely upset when she found out about this conversation, and in the month after she began this job, Ms. McCray met with Store Mgr. Peoples and Asst. Mgr. Kray to explain how disrespectful she found Store Mgr.

People's comments.

18.

Store Mgr. Peoples responded that she "thought something different because [Ms. McCray] had not indicated male or female on [her] application."

19.

However, even after Ms. McCray advised Store Mgr. Peoples that she wished to be referred to as female, Store Mgr. Peoples began referring to Ms. McCray as "he" later on in the same conversation.

20.

It soon became apparent that Store Mgr. People's misgendering of Ms. McCray was intentional.  For example, even though Store Mgr. Peoples would often refer to Ms. McCray as "he," a Team Lead told Ms. McCray that Peoples sometimes referred to Ms. McCray as female in conversations with others.  However, around the same time, a coworker named Walter advised Ms. McCray that Peoples told other employees that Ms. McCray liked to be called "he."

21.

Subsequently, Store Mgr. Peoples began referring to Ms. McCray almost exclusively using male pronouns.

22.

Additionally, when Store Mgr. Peoples heard employees referring to Ms. McCray as female, she would "correct" them and tell them to instead use male pronouns.

23.

Store Mgr. Peoples would engage in similar conduct on a routine and regular basis, including each shift that Peoples and Ms. McCray worked together.

24.

By May 2019, Store Mgr. Peoples' harassment had become so problematic that Ms. McCray felt the need to speak with her supervisor once again to remind her to use female pronouns.  While Peoples appeared to understand both how much this bothered Ms. McCray and what Ms. McCray was asking her to do, Store Mgr. Peoples once again began referring to Ms. McCray the day following that conversation.

25.

On September 17, 2019, on a day when Ms. McCray was not working, she and her sister visited one of Defendant's other stores that was closer to home in order to pay a utility bill.  Ms. McCray was tired, so she sent her sister into the store while she waited outside in the car. After going into the store, Ms. McCray's sister soon

returned to the car, telling Ms. McCray that the store employee said that the bar code on their utility invoice would not scan and they did not have the hand-held device they were supposed to have.  Ms. McCray had encountered problems in her position with these bar codes, and as a result, she believed that she could help resolve the issue.  Ms. McCray entered the store and asked to speak with a manager.

26.

As soon as Ms. McCray walked into the store, the manager, Ms. Yma, was immediately hostile to Ms. McCray.

27.

Ms. McCray told Ms. Yma that she worked at another location, and asked whether Ms. Yma's store had a hand-held device to scan the utility bill.  Ms. Yma was very combative in her responses to Ms. McCray.

28.

Ultimately, Ms. Yma called Store Mgr. Peoples, and Ms. McCray was able to hear both sides of the discussion since the call was on speaker.

29.

On her call with Store Mgr. Peoples, Ms. Yma immediately said, "hey girl, do you have a gay guy who works part of management!?"

30.

Store Mgr. Peoples responded to this question by asking whether Ms. Yma was referring to "Davin."

31.

Ms. Yma responded by saying, "I don't know what he's on," implying that Ms. McCray was under the influence of drugs.

32.

Upon information and belief, Ms. Yma then gave Store Mgr. Peoples an inaccurate explanation of what had occurred.

33.

At some point, Ms. Yma told Ms. McCray that she was "beneath" her and that, if the incident were reported to the district manager, he would not do anything to Ms. Yma.   Ms. Yma also had one of her male employees observing the conversation and he told Ms. McCray that he would put his hands on her if she did not leave the store.

34.

Ms. Yma ultimately called 911 about the incident, but when officers from the Norcross Police Department arrived, several by-standers explained that they had observed the entire incident and neither Ms. McCray, nor her sister, had done

anything wrong.

35.

While Ms. McCray's encounter with Ms. Yma ended without further incident, Ms. McCray felt ridiculed, disrespected, and dehumanized by the events.

36.

On the following day, Ms. McCray spoke to Store Mgr. Peoples and Asst. Mgr. Kray about the incident, and Ms. McCray ultimately asked for the number to human resources or Defendant's corporate office.

37.

Store Mgr. Peoples refused to provide Ms. McCray with a telephone number for HR or the corporate office, instead telling Ms. McCray to call District Manager Bill McClellan (hereinafter, "District Mgr. McClellan").

38.

Ms. McCray called District Mgr. McClellan soon thereafter, and she told him about the incident the previous day, as well as the ongoing problems that she was experiencing in her own store.

39.

Ms. McCray also asked District Mgr. McClellan for the number to HR, but he expressly refused to provide that number, instead telling Ms. McCray, "don't call

HR, I will handle the situation."

40.

In addition to their conversation over the phone, Ms. McCray also sent an email to District Mgr. McClellan describing the incidents the previous day.

41.

However, District Mgr. McClellan failed to follow up with Ms. McCray, and it was apparent that he took no actions to address Ms. McCray's concerns.

42.

District Mgr. McClellan even came to Ms. McCray's store several days later, and while he had a brief exchange with Ms. McCray, he did not mention anything concerning Ms. McCray's allegations.

43.

Assistant Mgr. Kray was apparently so disgusted by the District Manager's response, or lack thereof, that she began keeping a log of the harassment of which Ms. McCray was being subjected due to her gender identity.

44.

The work environment had become so unbearably hostile that Ms. McCray planned to resign from her position in early 2020. However, she ultimately decided that she could not leave as the result of an unexpected family emergency.

11

45.

Store Mgr. Peoples knew about Ms. McCray's family emergency, but she forced Ms. McCray to work the following day, even though Asst. Mgr. Kray offered and was able to cover Ms. McCray's shift.

46.

Store Mgr. Peoples continued referring to Ms. McCray as "he" continuing into the year 2020.

47.

Ms. McCray knew that Store Mgr. Peoples was referring to her as male behind her back because customers frequently asked Ms. McCray about her preferred pronouns since Store Mgr. People would refer to her as male to the customers. Customers found this to be confusing since Ms. McCray clearly presents as female.

48.

Critically, Store Mgr. Peoples' actions of "outing" Ms. McCray, or disclosing her gender identity to third-parties without Ms. McCray's permission, unnecessarily exposes Ms. McCray's personal information and, as is evidence below, presents a risk to Ms. McCray's safety.

49.

Once again, Ms. McCray spoke to Store Mgr. Peoples about how she would

like to be addressed, and Store Mgr. Peoples' only response was that she "forget[s] sometimes."

50.

However, even after this conversation Ms. McCray overheard, and her coworkers also told her, that Store Mgr. Peoples was still constantly referring to her as male.

51.

One of Ms. McCray's coworkers, Adrianna Cook, described how in late 2019 and early 2020 Store Mgr. Peoples continued referring to Ms. McCray as male with both customers and employees, how Store Mgr. Peoples would correct employees who referred to Ms. McCray, correctly, as female, and how Store Mgr. People's conduct would cause customers to become confused.

52.

Ms. Cook also observed the "sadness" and "grief" that Ms. McCray expressed in response to Store Mgr. People's behavior, that she did not understand why the Store Manager could not seem to respect Ms. McCray, and that she believed that Ms. McCray was being subjected to "gender discrimination."

53.

Similarly, a coworker who began working in January 2020, Jordan Brown,

described observing similar conduct from Store Mgr. Peoples, as well as the fact that Store Mgr. Peoples appeared to assign more time-consuming tasks to Ms. McCray than to the other employees.

54.

Asst. Mgr. Krey has also provided her account of Store Mgr. People's conduct, and explained that on some days Ms. McCray "would be so stressed, she wouldn't want to even talk, come to work, or be seen."  Asst. Mgr. Krey observed that the Store Manager would discipline Ms. McCray for minor issues, and much more quickly than her propensity to discipline other employees.

55.

Asst. Mgr. Krey also said that she was "happy the day [Ms. McCray] told me she was finally leaving, happiest I ever saw her."

56.

Store Mgr. Peoples even refused to refer to Ms. McCray using the proper pronouns in text messages that she exchanged with Ms. McCray's mother.

57.

On one occasion, Store Mgr. Peoples referred to Ms. McCray as a "prototype," which Ms. McCray understood to be a derogatory comment based on the fact that she identifies as transgender or that Peoples' was suggesting that Ms. McCray was

not a real woman.

58.

On another occasion in 2020, employees found a snake that was loose in the store.  Upon learning about the snake, Store Mgr. Peoples commented that a man needed to remove the snake, and then she immediately directed Ms. McCray to take care of the problem.

59.

On another occasion, two customers shopping in the store called Ms. McCray a number of epithets, including a "man," "bitch," "faggot," and "tranny."  The customers also threatened Ms. McCray with physical violence before they left the store.  Ms. McCray reported this incident to Store Mgr. Peoples, but when the customers later came back into the store, the Store Manager spoke with them and offered Dollar General gift cards as a result of their troubles.

60.

On another occasion, Ms. McCray was acting as the lead manager on a shift when she was approached by a male customer.  This customer began making comments that were clearly intended as sexual advances, including admiring Ms. McCray's looks and asking for Ms. McCray's relationship status.

61.

While standing in front of Ms. McCray and within arm's reach of her, the customer proceeded to pull down his pants and he displayed his penis toward Ms. McCray.  At that time, the customer told Ms. McCray that he bet that her boyfriend's penis was not as large as his, he tried to get Ms. McCray to look in the direction of his genitalia, and he even attempted to get her to touch his penis.  When Ms. McCray resisted, the customer become aggressive, and it appeared that he was going to attack Ms. McCray.  Eventually, Ms. McCray move quickly away from the man who eventually left the store.

62.

This incident made Ms. McCray concerned for her safety since she was the only employee in the store at the time, and as a result, she called and report the incident to Store Mgr. Peoples, who said that if the man came back to the store, they would call the police.

63.

Previously, when another female employee was harassed by an intoxicated, male customer while she was alone working in the store, Store Mgr. Peoples banned the customer from the store.

64.

However, the man who harassed Ms. McCray did come back to the store, and Ms. McCray pointed him out to Store Mgr. Peoples.  The Store Manager did not call the police or do anything else in response.  As Store Mgr. Peoples shrugged off Ms. McCray, she explained that she knew the gentleman, had actually dated him previously, and he was a "good guy" who had recently gone through hard times including a divorce.

65.

Ms. McCray never received a response from District Mgr. McClellan concerning her complaints, she was never provided with contact information for HR, and the conduct continued on a routine and regular basis.

66.

On another occasion, Ms. McCray reported an incident where a coworker threw a box of straight razors in the direction of Ms. McCray's face.  Store Mgr. Peoples reported the incident to District Mgr. McClellan, who failed to address the situation or actually hold a meeting with the coworker as he promised.  Additionally, the coworker was not written up for this situation.

67.

As a result of Store Mgr. Peoples' actions, some of Ms. McCray's coworkers

continued to refer to her as male. One coworker named Aaliyah who was confronted and corrected by another supervisor when she misgendered Ms. McCray. In response, Aaliyah shot back, "she… he … whatever."  Aaliyah also told the other manager that she did not think she had done anything wrong since Store Mgr. Peoples had told her that Ms. McCray should be referred to as male.

68.

In September 2020, the harassment that Ms. McCray experienced had become so bad and so constant that they were intolerable.  Additionally, as a result of the several incidents with customers and coworkers, Ms. McCray had become extremely concerned for her safety both in and out of the work.

69.

As a result, the working conditions were so intolerable that Ms. McCray felt like she did not have any choice but to resign from her position on September 16, 2020.

70.

However, before she left, Ms. McCray found out that Defendant had failed to provide any of the employees at this store with Defendant's "2020 Creating a Harassment and Discrimination Free Workplace" training, and that this was a training that Store Mgr. Peoples did not require her subordinates to complete.

71.

Store Mgr. Peoples never received any disciplinary action for her harassment of Ms. McCray, and she was terminated in or around November 2021 for reasons that had nothing to do with Ms. McCray.

Procedural/Administrative Background

72.

On November 6, 2020, after she had made initial contact before her resignation, Ms. McCray submitted a Charge of Discrimination to the Equal Employment Opportunity Commission (hereinafter, "EEOC"). (EEOC Charge No. 410-2020-07632).

73.

Defendant had notice of Ms. McCray's Charge, participated in the administrative proceedings, and was represented by counsel at the time.

74.

On September 28, 2021, the EEOC issued its "Determination," finding that Defendant had indeed subjected Ms. McCray to a hostile work environment based on her sex in violation of Title VII of the Civil Rights Act, as well as constructive discharging Ms. McCray.

75.

After Conciliation Failed, The EEOC issued a Notice of Right to Sue dated October 15, 2021.

76.

Ms. McCray has exhausted her administrative remedies, and she is filing the instant litigation within ninety (90) days of her receipt of the Notice of Right to Sue.

**COUNT I:**
**HOSTILE WORK ENVIRONMENT DUE TO SEX**
**IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT**

77.

Plaintiff hereby pleads and incorporates by reference all of the allegations contained in Paragraphs 1 through 76, as if the same were set forth herein.

78.

Under Title VII of the Civil Right Act, it is unlawful for an employer to discriminate against or harass any of its employees on the basis of sex. *See* 42 U.S.C. § 2000e-2(a).

79.

Title VII's prohibition on discrimination based on sex includes an employer who discriminates against an individual because of their gender identity. *Bostock v. Clayton Cnty.*, 590 U.S. ____, 140 S. Ct. 1731 (2020).

80.

As alleged herein, Defendant and Plaintiff are a covered, non-exempt employer and employee under Title VII, respectively.  *See* 42 U.S.C. §§ 2000e & 2000e-1.

81.

To establish a claim of hostile work environment, a plaintiff must show 1) that she was subjected to harassment in the form of unwelcome verbal or physical conduct because of a statutorily protected basis; 2) that the harassment had the purpose of effect of unreasonably interfering with the work environment and/or created an intimidating, hostile, or offensive work environment.  *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993).

82.

According to the Equal Employment Opportunity Commission, "supervisors and coworkers should use the name and gender pronoun that corresponds to the gender identity with which the employee identifies in employee records and in communications with and about the employee."  *Lusardi v, McHugh*, EEOC Dec. No. 0120133395, 2015 WL 1607756, at *11 (2015) (citing *Jameson v. U.S. Postal Serv.*, EEOC Dec. No. 0120130992, 2013 WL 2368729 (2013)).

83.

Additionally, continued, intentional misuse of an employee's name and pronouns may undermine such employee's treatment during a gender transition, is contrary to the idea of treating transgender employees with dignity and respect, and it could also breach the employee's privacy and create a risk of harm to the employee. *Id.* (citation omitted).

84.

Plaintiff is a member of a protected class in that she is female and identifies as transgender.

85.

As alleged herein, Defendant, through both Plaintiff's coworkers and supervisors, subjected Plaintiff to a hostile work environment based on her sex and gender identity.

86.

As alleged herein, for a period of nearly two years, Plaintiff's direct supervisor would constantly and on a daily basis refer to Plaintiff as male in front of other employees and customers.

87.

The supervisor's conduct was intentional as she was fully aware that Plaintiff is female and identifies as such.

88.

As a result of her supervisor's conduct, including by explicitly telling employees and customers to refer to Plaintiff as male, Plaintiff's was frequently misgendered by such customers and coworkers.

89.

Plaintiff was subjected to other slurs and harassment during her tenure, like when the manager of another store referred to Plaintiff as a homosexual male, accused Plaintiff of being under the influence of drugs, and called the police on Plaintiff when she had not done anything wrong.

90.

As alleged herein, Plaintiff's direct supervisor once referred to her as a "prototype," which was clearly intended as a derogatory remark concerning Plaintiff's gender identity.

91.

On another occasion, the same supervisor made Plaintiff dispose of a snake that had entered the store because, as she had previously stated, it was a job for a man.

92.

Plaintiff was also subjected to harassment in the form of a coworker throwing dangerous items at her face and being sexually harassed by several male customers; yet, management refused to take any actions and supervisor actively prevented Plaintiff from contacting human resources.

93.

As alleged herein, Plaintiff was targeted by her supervisors who issued disciplinary action for minor incidents for which others would not have been similarly disciplined, and her supervisor frequently assigned Plaintiff with less-desirable tasks.

94.

Any reasonable person in Plaintiff's position would find all of the alleged conduct, individually or taken together, extremely offensive. Accordingly, Plaintiff was subjected to conduct that was objectively offensive.

95.

Similarly, several of Plaintiff's former coworkers found the conduct that Plaintiff was subjected objectively offensive.

96.

Plaintiff found the alleged conduct subjectively offensive and unwelcomed.

97.

The aforementioned conduct was based on Plaintiff's sex and her gender identity.

98.

The harassment that Plaintiff experienced was both severe, and given that she experienced it on a near-daily basis, the harassment was pervasive in the workplace.

99.

Some of the harassment that Plaintiff experienced was from her supervisors. As a result, Defendant is liable for the conduct.

100.

Plaintiff complained about her coworker's conduct to management throughout the entirety of Plaintiff's tenure, but Defendant failed to take any measures to prevent the harassment.   As a result, Defendant is liable for the harassment that Plaintiff experienced from her coworkers.

101.

Defendant failed to take any care to prevent and correct the harassment that Plaintiff experienced.

102.

Plaintiff complained about the harassment and requested that Defendant take remedial measures, but Plaintiff's requests were often ignored, and no remedial measures were taken.  As a result, the harassment continued.

103.

Defendant is unable to articulate any legitimate, nondiscriminatory reason for the aforementioned offensive conduct.

104.

Plaintiff has been injured by Defendant's harassment and hostile work environment, and Plaintiff is entitled to all damages allowed under Title VII of the Civil Rights Act, including back pay, front pay and injunctive relief, compensatory and punitive damages in the amount of no less than $300,000.00, and reasonable attorney's fees and costs of litigation, all in an amount to be proven at trial.

**COUNT II:**
**DISCRIMINATION BASED ON SEX**
**IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT**

105.

Plaintiff hereby pleads and incorporates by reference all of the allegations contained in Paragraphs 1 through 76, as if the same were set forth herein.

106.

Under Title VII of the Civil Right Act, it is unlawful for an employer to discriminate against any of its employees on the basis of sex. *See* 42 U.S.C. § 2000e-2(a).

107.

Title VII's prohibition on discrimination based on sex includes an employer who discriminates against an individual because of their gender identity. *Bostock v. Clayton Cnty.*, 590 U.S. ____, 140 S. Ct. 1731 (2020).

108.

As alleged herein, Defendant and Plaintiff are a covered, non-exempt employer and employee under Title VII, respectively. *See* 42 U.S.C. §§ 2000e & 2000e-1.

109.

Plaintiff is a member of a protected class in that she is female and identifies as transgender.

110.

As alleged herein, Plaintiff was qualified for her position and she was satisfactorily performing her duties.

111.

As alleged herein, Plaintiff was subjected to numerous adverse employment actions during her tenure, including being subjected to derogatory and offensive language and conduct by employees and customers, not being protected from employees and customers responsible for the offensive conduct, being assigned to less desirable work, being disciplined for minor incidents, and having a manager at another store call the police on Plaintiff without any legitimate basis.

112.

The aforementioned conduct was either explicitly tied to Plaintiff's sex or gender identity, or the circumstances otherwise suggest that Plaintiff's sex and gender identity were the basis for the conduct.

113.

Defendant is unable to articulate any legitimate, nondiscriminatory reason for the aforementioned offensive conduct.

114.

Plaintiff has been injured by Defendant's discrimination based on her sex, and Plaintiff is entitled to all damages allowed under Title VII of the Civil Rights Act, including back pay, front pay and injunctive relief, compensatory and punitive damages in the amount of no less than $300,000.00, and reasonable attorney's fees and costs of litigation, all in an amount to be proven at trial.

## COUNT III:
## CONSTRUCTIVE DISCHARGE
## IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT

115.

Plaintiff hereby pleads and incorporates by reference all of the allegations contained in Paragraphs 1 through 76, as if the same were set forth herein.

116.

Under Title VII of the Civil Right Act, it is unlawful for an employer to discriminate against or harass any of its employees on the basis of sex.  *See* 42 U.S.C. § 2000e-2(a).

117.

Title VII's prohibition on discrimination based on sex includes an employer who discriminates against an individual because of their gender identity. *Bostock v. Clayton Cnty.*, 590 U.S. ____, 140 S. Ct. 1731 (2020).

118.

As alleged herein, Defendant and Plaintiff are a covered, non-exempt employer and employee under Title VII, respectively. *See* 42 U.S.C. §§ 2000e & 2000e-1.

119.

A claim for constructive discharge "is appropriate when an employer discriminated against an employee to the point that [her] working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign." *Hicks v. City of Tuscaloosa, Ala.*, 870 F.3d 1253, 1258 (11th Cir. 2017).

120.

As alleged in Count I, *supra*, which is incorporated herein by reference, Defendant discriminated against Plaintiff and subjected her to harassment to the point that Plaintiff's working conditions had become so intolerable that she felt compelled to resign in September 2020.

121.

Not only did the discrimination and harassment leave Plaintiff feeling humiliated, embarrassed, and dehumanized, she had legitimate concerns for her safety in the workplace and as she traveled to and from work.

122.

Moreover, given that several of Plaintiff's former coworkers felt like Plaintiff was being subjected to discrimination and harassment and were understanding when she resigned, that would suggest that any reasonable person in Plaintiff's position would have also felt compelled to resign.

123.

Plaintiff has been injured by Defendant's constructive discharge of her, and Plaintiff is entitled to all damages allowed under Title VII of the Civil Rights Act, including back pay, front pay and injunctive relief, compensatory and punitive damages in the amount of no less than $300,000.00, and reasonable attorney's fees and costs of litigation, all in an amount to be proven at trial.

**JURY DEMAND**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Davin McCray respectfully prays for the following relief:

1)      That Summons and Process be issued to Defendant DOLGENCORP, LLC, d/b/a Dollar General Corporation, and that said Defendant be served as provided by law;

2)      That this matter be tried before a jury;

3)      That judgment be awarded for and in favor of Plaintiff and against Defendant on Count I for subjecting Plaintiff to harassment and a hostile work environment based on sex, and grant Plaintiff all relief allowable under Title VII of the Civil Rights Act;

4)      That judgment be awarded for and in favor of Plaintiff and against Defendant on Count II for discrimination based on sex, and grant Plaintiff all relief allowable under Title VII of the Civil Rights Act;

5)      That judgment be awarded for and in favor of Plaintiff and against Defendant on Count III for Defendant's constructive discharge of Plaintiff, and grant Plaintiff all relief allowable under Title VII of the Civil Rights Act; and,

6)      For such other relief as this Court shall deem just and proper.

*[Signature Page Follows]*

Respectfully submitted, this 13th day of January, 2022.

KENNETH E. BARTON III
Georgia Bar No. 301171
EMILY M. WALKER
Georgia Bar No. 221826
*Attorneys for Plaintiff*

COOPER, BARTON & COOPER, LLP
170 College Street
Macon, Georgia 31201
(478) 841-9007 telephone
(478) 841-9002 facsimile
keb@cooperbarton.com
emw@cooperbarton.com